**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**DENNIS M. WILLIAMS,**

      **Petitioner,**

    **v.**                        **Civil Action 2:05-CV-985
Judge Holschuh
Magistrate Judge King**

**PAT HURLEY, Warden,**

      **Respondent.**

**REPORT AND RECOMMENDATION**

Petitioner, a state prisoner, brings the instant petition for a writ of habeas corpus pursuant to 28 U.S.C. §2254.  This matter is before the Court on the instant petition, respondent's return of writ, and the exhibits of the parties.   For the reasons that follow, the Magistrate Judge **RECOMMENDS** that this action be **DISMISSED.**

**I.  FACTS**

The Ohio Tenth District Court of Appeals summarized the facts of this case as follows:

> At trial, LaToya Dixon ("Dixon") testified that she invited appellant to her apartment to have sex. Appellant arrived at Dixon's apartment with "some other guys," whom she did not know. Dixon learned that appellant wanted her to have sex not only with him, but with his friends as well. While appellant and his friends were in Dixon's apartment, Dixon spoke briefly with her neighbor, Emmitt Grant ("Grant"). While Dixon and Grant were talking, appellant's friends were looking through the peephole of the apartment door. Appellant's friends asked Dixon why she was talking to Grant. She told them that Grant was "just my neighbor. He's not doing anything." (Tr. at 45.) Grant knew that Dixon did not smoke, so she asked him for a Black & Mild cigar to let him know that something might be wrong. Dixon then returned to her apartment.
>
> When Dixon returned, appellant asked his friends to leave for a

while. Dixon told appellant she no longer wanted to have sex because she was uncomfortable with appellant's friends being around. Fearing trouble, Dixon left her apartment. Appellant's friends returned to Dixon's apartment as she was leaving.

As Dixon left, she saw two people near the swimming pool. She recognized Jerramie Hill ("Jerramie"), who was with his brother, John Hill, Jr. ("John"). As she was speaking with them, Dixon asked Jerramie and John to come to the other side of the apartments because she feared if they were seen talking to her there might be some type of trouble. The brothers asked her if she needed to go to their apartment, which was nearby. Dixon told them no, but also told them "Don't try to get involved in anything. Just walk back to your house." (Tr. at 447.)

Dixon testified that as Jerramie and John began to walk the short distance to their apartment, appellant and his friends suddenly confronted them. Dixon ran upstairs to her apartment but returned shortly thereafter to Jerramie and John's window, where she saw one of appellant's friends inside the apartment holding compact discs. Dixon described Jerramie and John's apartment as being "demolished," and stated that the glass was broken out of the window in which she was looking. She testified she saw blood on the bathroom wall, and that she saw the hand of one of the Hill brothers on the bathroom door.

Dixon testified she "heard a lot of beating going on * * * just like the boys was getting like stomped or something like that. * * * It sounded brutal to me. * * * Because I could hear them stomping on them, beating on them, doing whatever they was doing to them." (Tr. at 51-52.) Dixon testified that she stayed at the window and listened to the beatings for one-half hour, and then fled to a neighbor's house. (Tr. at 52-53.) Dixon later identified appellant's picture from a police photo array, but she was not able to identify any of appellant's accomplices.

Emmitt Grant lived in an apartment across from Dixon. He testified that he tried to act like a big brother towards Dixon because she was young and living alone. He testified that on the night in question he had been in his apartment all evening. Grant had company earlier that evening, but they left at approximately 1:30 a.m. Shortly thereafter, Grant noticed that Dixon had some company arriving, none of whom he recognized.

Grant was playing a video game in his apartment. He had his front door open because it was hot. When he saw Dixon's company arriving, he closed his door. Shortly thereafter, Dixon knocked and asked for a Black and Mild cigar. As Dixon returned to her own apartment, her company opened her door, where "they was all piled up in the door and looking out." (Tr. at 84-85.) Grant exchanged greetings with Dixon's company. Grant testified that his encounter with Dixon's company was not out of the ordinary.

Grant then closed his apartment door, but shortly thereafter he opened it again. Grant said he did so because "I didn't want them to think I was scared because I closed my door. It wasn't closed before they got there. I opened up my door back up and continued to play my [video] game." (Tr. at 86.) Some minutes later, "all the guys came on the porch, and I'm hearing like a confrontation going on outside." (Tr. at 86.) Grant returned to playing his video game because "it didn't have anything to do with me." (Tr. at 87.)

Shortly thereafter, one of appellant's companions blocked Grant's doorway. Appellant then entered Grant's apartment. After a brief conversation, another one of appellant's companions ("first assailant") came into Grant's apartment and took a swing at him. Grant attempted to defend himself. While Grant was struggling with the first assailant, a gun fell to the floor out of the first assailant's clothes. Grant testified appellant picked the gun up. Grant testified a second assailant, who was not the appellant, struck him three times over the head with a table. A third assailant, who also was not the appellant, knocked over Grant's entertainment center, strewing Grant's video, television and video game equipment around the room. Grant testified that shortly thereafter, appellant grabbed a cord from a video recorder and began to strangle him. Grant testified that after he wouldn't fall, appellant told his friends, "Let's drag him to the back." (Tr. at 91.) Grant testified that he feared he would be killed.

At that point, Grant continued to struggle and escaped his assailants. He ran as far as he could and ultimately collapsed in front of an apartment door, and he asked its occupant to call the police. He remained there until the police arrived. The police officers walked Grant back to his apartment, where Grant discovered many of his personal items were missing.

Six days later, a detective from the Columbus Police Department asked Grant to come to police headquarters. The detective showed Grant a photo array and asked him if he saw any of the people who

3

were in his apartment. Grant identified appellant and marked his picture as the "leader." He identified appellant at trial as the same person he identified in the photo array. Grant also identified photographs depicting his wounds, blood on his clothing, his missing property, and the mark of the cord that was wrapped around his neck.

Jerramie and John Hill lived in the same apartment complex as Dixon and Grant. Jerramie testified that on the night in question, he and John saw Dixon and that she appeared to be scared. As Jerramie and John began to go to their apartment, three people confronted them. The three people checked Jerramie and John to see if they had any weapons. One of the three punched John in the mouth, causing him to spit blood. John and Jerramie then entered their apartment.

Shortly thereafter, one of the assailants who just confronted them entered their apartment through a window and let the other two people in through the front door. Two of the assailants took John into the back room, and one remained with Jerramie. Jerramie tried to leave, but he was grabbed and beaten. Jerramie described being kicked, punched, hit in the head with an industrial air blower, and having people stomp on his head. The last place Jerramie remembered seeing John, was in the bedroom. At some point, Jerramie became unaware of what was happening around him because of the beating he suffered. Jerramie testified that the next thing he remembered was the arrival of the paramedics.

At trial, Jerramie identified photographs describing the condition of his apartment on the night in question. He identified items that had been taken from his apartment. Jerramie also identified photographs that depicted his injuries, including photographs that showed tread marks on his face from the bottom of one of his assailants' shoes.

Columbus Police Officer Patrick Seaman ("Seaman") testified he was dispatched on a call to the apartment complex where Dixon, Grant, and the Hills lived. Because the apartment complex is large, Seaman was having difficulty finding the specific address to which he had been dispatched. In the meantime, Seaman received another call dispatching him to a different address in the same complex. Seaman went to the second address, where he found Grant. Seaman requested a medic from the Columbus Fire Department to treat Grant's wounds.

Seaman then went on to Grant's apartment, and on the way there spotted a video game system lying on the ground. As he approached the video game, Seaman noticed an open window and an open door

4

at the apartment that was later identified as the Hills' brothers apartment. Seaman saw a trail of blood and noted the destruction in the apartment. Seaman reached the back bedroom, where he saw both Jerramie and John. Seaman then called for other officers and medics to assist him. Seaman originally thought both Jerramie and John were dead.

Rhonda Cadwallader ("Cadwallader"), a latent fingerprint examiner for the Columbus Police Department, testified that appellant's palm print was found inside Jerramie and John's apartment. She further testified that the latent prints taken from the apartment matched appellant's known prints.

Columbus Police Detective Carl Rankin ("Rankin") was the lead detective on this incident. Rankin testified he talked to Grant the night of the incident and it was obvious Grant "had just gone through an ordeal." (Tr. at 375.) Rankin noticed several abrasions and bruises on Grant. The most significant injury Rankin noted was the linear bruising directly from ear to ear on Grant. Rankin testified that the linear bruising was consistent with a ligature mark which results from strangulation. He also testified that the ligature mark was much more pronounced in person than it appeared in the crime scene photographs.

During his investigation, Rankin "became aware of an individual by the name of Mikey," who was later determined to be the appellant. (Tr. at 380.) Rankin then prepared a photo array and showed it to Dixon and Grant separately. Dixon and Grant each identified appellant as a person who was involved in this incident. After appellant was arrested he was taken to police headquarters, where Rankin interviewed him. Appellant signed a written waiver of his constitutional rights and agreed to speak to Rankin without having a lawyer present. [FN2] Rankin's interview of appellant was recorded on videotape, which was played for the jury.

FN2. The circumstances surrounding appellant's signed waiver are discussed in greater detail infra as part of appellant's second assignment of error.

Appellant admitted being present at both the Hill and Grant apartments. Appellant stated he first went to Dixon's apartment with some friends, under the impression that Dixon intended to have sex with all of them. After Dixon declined to do so, appellant stated that one of his friends came into Dixon's apartment and told him that

5

some "dude out here talking crazy. Man, we're about to whip his * * * ass." (Tr. at 407.) Appellant stated that he then joined his friends on the porch.

Appellant stated that Grant was "talking shit" while he was sitting on his couch in his apartment playing a video game, and that he and his friends "run in there, rough him up." (Tr. at 408.)

Appellant denied taking any property from Grant's apartment. Appellant said that Rankin had the wrong man, and that Rankin should be talking to Gerald Brown. Appellant denied using any weapons, and specifically denied picking up a gun or that a gun was even present.

Appellant stated that Grant left his apartment, so appellant and his friends also left. On their way down the stairs from Grant's apartment, "there goes the other [people] that was talking shit right there. * * * They started running. We followed them, went in with them, whooped their ass." (Tr. at 424.) Appellant stated that he and his friends then left and returned to their cars. Appellant denied using any weapons and denied taking any possessions from either apartment.

Dr. Dorothy Dean ("Dean"), a forensic pathologist, performed an autopsy on John Hill. Dean testified that John had eight gunshot entry wounds: two in the right arm, three in the chest, and three in the right side of his back. She further testified at least two bullets went through John's lungs and heart. She also identified several fresh flesh wounds and stated the injury to his mouth was consistent with damage that a fist would cause. Dean testified John's death was caused by multiple gunshot wounds to his torso that went through his lungs and heart.

Exhibit 11 to Return of Writ.

## II. PROCEDURAL HISTORY

Petitioner was indicted by the September 2001 term of the Franklin County grand jury on two counts of aggravated burglary, in violation of O.R.C. §2911.11, three counts of aggravated robbery, in violation of O.R.C. §2911.01, two counts of attempted murder, in violation of O.R.C. §§2923.02, 2903.02, two counts of felonious assault, in violation of 2903.11, two counts of

aggravated murder, in violation of O.R.C. §2903.01, and having a weapon while under disability, in violation of O.R.C. §2923.13, with specifications.  Exhibit 1 to Return of Writ.  Petitioner waived jury trial on the charge of having a weapon while under disability, but proceeded to jury trial on all other charges.  He was found guilty of all charges except the specification of being principal offender during the aggravated robbery, and on December 4, 2002, he was sentenced to an aggregate term of seventy years to life imprisonment.  Doc. Nos. 6, 7.  Represented by new counsel, petitioner filed a timely appeal.  He asserted the following assignments of error:

> 1.   The trial court erred when it entered judgment against the defendant when the evidence was insufficient to sustain a conviction and was not supported by the manifest weight of the evidence.
>
> 2.   The trial court erred by denying defendant-appellant's pretrial motion to suppress statement thereby violating his rights under the Federal and State Constitutions.

Exhibit 9 to Return of Writ.  On December 30, 2003, the appellate court affirmed the judgment of the trial court.  Exhibit 11 to Return of Writ.  Petitioner did not file a timely appeal of the appellate court's decision to the Ohio Supreme Court; however, on October 26, 2004, he filed a motion for delayed appeal pursuant to Ohio Supreme Court Rule of Practice II, Section 2(A)(4)(a), which provides:

> In a felony case, when the time has expired for filing a notice of appeal in the Supreme Court, the appellant may seek to file a delayed appeal by filing a motion for delayed appeal and a notice of appeal. The motion shall state the date of entry of the judgment being appealed and adequate reasons for the delay. Facts supporting the motion shall be set forth in an affidavit. A copy of the court of appeals opinion and the judgment entry being appealed shall be attached to the motion.

Exhibit 15 to Return of Writ.  On December 15, 2004, the Ohio Supreme Court denied petitioner's motion for delayed appeal and dismissed the appeal.  Exhibit 16 to Return of Writ.  On March 14,

2004, petitioner filed a delayed *pro se* application to reopen the appeal pursuant to Ohio Appellate

Rule 26(B).  Petitioner asserted that he had been denied the effective assistance of counsel because

his attorney failed to raise on appeal an issue regarding improper admission of his statement to

police.  Exhibit 12 to Return of Writ.  On May 4, 2004, the appellate court dismissed petitioner's

delayed 26(B) application.  Exhibit 14 to Return of Writ.  Petitioner apparently never filed an appeal

of the appellate court's decision to the Ohio Supreme Court.[1]  On April 12, 2005, petitioner filed a

motion for modification and correction of sentence with the state trial court in which he asserted that

he had been improperly sentenced in violation of *Blakely v. Washington*, 542 U.S. 296 (2004).  On

April 22, 2005, the state filed its response.  Exhibit 18 to Return of Writ.  In May 2005, petitioner

filed his reply.  Exhibit 19 to Return of Writ.  However, petitioner's motion apparently remains

pending in the state trial court.  *See Return of Writ,* at 4.

On October 27, 2005, petitioner filed the instant *pro se* petition for a writ of habeas corpus

pursuant to 28 U.S.C. §2254.  He alleges that he is in custody of the respondent in violation of the

Constitution of the United States based upon the following grounds:

> 1.  Insufficient evidence and manifest weight of the evidence.
>
> Appellant's convictions were based on insufficient evidence and
> contrary to manifest weight of the evidence.  There was no physical
> or circumstantial evidence that placed any weapon in appellant's
> possession, also no evidence to place appellant at the scene of
> homicide.  The State relied on accomplice liability.
>
> 2.  The accused is deprived of a fair trial when the court refused to
> grant [the] motion to suppress his statement.
>
> The appellant's statements were allowed to be played during trial,

---

[1] Petitioner states that he did not know that he had the right to appeal the appellate court's decision.  *Petition,* at 4.

8

although appellant asked for his attorneys numerous times during his police interview. Also during this interview, appellant was coerced with promises and threatened with jail time. Allowing [his] statement into trial was a violation of the privilege against self incrimination.

3. Imposi[tion of] non-minimum and consecutive sentences.

Petitioner is a first time offender who was given more than the minimum sentence allowed by Ohio statutes without the court's giving facts and findings as to why petitioner was given a maximum and consecutive sentence.

4. Ineffective assistance of trial and appellate counsel raised in 26(B).

Petitioner's trial was compromised because his trial counsel refused to call any witnesses [and] also because trial counsel performed a weak cross examination. Appellate counsel compromised petitioner's appeal by lack of communication with petitioner and also by only raising two arguments on direct appeal, neither of which was a claim of ineffective assistance of trial counsel.

It is the position of the respondent that claim three is unexhausted, or presents an issue of state law that is not appropriate for federal habeas corpus review, and that the remainder of petitioner's claims are procedurally defaulted.

### III. PROCEDURAL DEFAULT

In recognition of the equal obligation of the state courts to protect the constitutional rights of criminal defendants, and in order to prevent needless friction between the state and federal courts, a state criminal defendant with federal constitutional claims is required fairly to present those claims to the highest court of the state for consideration. 28 U.S.C. §2254(b), (c). If he fails to do so, but still has an avenue open to him by which he may present the claims, his petition is subject to dismissal for failure to exhaust state remedies. *Id.; Anderson v. Harless*, 459 U.S. 4, 6 (1982) *(per curiam)*; *Picard v. Connor*, 404 U.S. 270, 275-76 (1971). If, because of a procedural default, the

9

petitioner can no longer present his claims to a state court, he has also waived them for purposes of federal habeas review unless he can demonstrate cause for the procedural default and actual prejudice resulting from the alleged constitutional error. *Murray v. Carrier*, 447 U.S. 478, 485 (1986); *Engle v. Issac*, 456 U.S. 107, 129 (1982); *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977).

In the Sixth Circuit, a four-part analysis must be undertaken when the state argues that a federal habeas claim is precluded by the petitioner's failure to observe a state procedural rule. *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986). "First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule." *Id.* Second, the Court must determine whether the state courts actually enforced the state procedural sanction. *Id.* Third, it must be decided whether the state procedural forfeiture is an adequate and independent state ground on which the state can rely to foreclose review of a federal constitutional claim. *Id.* Finally, if the Court has determined that a state procedural rule was not complied with and that the rule was an adequate and independent state ground, then the petitioner is required to demonstrate that there was cause for him not to follow the procedural rule and that he was actually prejudiced by the alleged constitutional error. *Id.* This "cause and prejudice" analysis also applies to failure to raise or preserve issues for review at the appellate level. *Leroy v. Marshall,* 757 F.2d 94 (6th Cir. 1985).

In claim one, petitioner asserts that his convictions were against the manifest weight of the evidence, and that the evidence was constitutionally insufficient to sustain his convictions.  In claim two, petitioner asserts that he was denied a fair trial by admission of his statements to police.  Such claims are readily apparent from the face of the record and were properly raised on direct appeal; however, petitioner failed to file a timely appeal to the Ohio Supreme Court from the appellate

court's December 30, 2004, decision dismissing his claims.  Instead, on  October 26, 2004, he filed

a motion for delayed appeal pursuant to Ohio Supreme Court Rule of Practice II, Section 2(A)(4)(a).

The Ohio Supreme Court summarily denied petitioner's motion for delayed appeal.

In *Bonilla v. Hurley*, 370 F.3d 494, 497 (6th Cir. 2004), the United States Court of Appeals

for the Sixth Circuit held that the Ohio Supreme Court's summary dismissal of a motion for delayed

appeal under such circumstances constitutes a procedural bar to consideration of the claims raised

therein:

> This case turns upon whether the Ohio Supreme Court entry denying
> Bonilla's motion for leave to file a delayed appeal constitutes a
> procedural ruling sufficient to bar federal court review of Bonilla's
> habeas corpus petition. Upon examination of the Ohio Supreme Court
> Rules, we conclude that it does. The Ohio Supreme Court Rules
> require a motion for a delayed appeal to state "the date of entry of the
> judgment being appealed and adequate reasons for the delay." Ohio
> Sup.Ct. R. II, Section 2(A)(4)(a). In addition, the motion must be
> accompanied by a supporting affidavit and a "copy of the decision
> being appealed." *Id.* A motion for a delayed appeal is not required to
> contain the actual claims and supporting arguments sought to be
> presented on appeal. *Id.* Instead, only when "the Supreme Court
> grants a motion for delayed appeal," is the appellant required to "file
> a memorandum in support of jurisdiction." Ohio Sup.Ct. R. II,
> Section 2(A)(4)(c). Thus, the applicable Ohio court rules indicate that
> the denial of a motion for a delayed appeal is a procedural ruling, not
> a ruling on the merits.

*Id*. This Court therefore likewise concludes that petitioner has procedurally defaulted claims one

and two of his federal habeas corpus petition.

In claim four, petitioner asserts that he was denied the effective assistance of trial counsel

because his attorney "refused to call any witnesses" and "performed weak cross examinations."

*Petition,* at 6.  He also asserts that he was denied the effective assistance of appellate counsel

because his attorney failed to communicate with him, and raised only two issues on appeal, neither

11

of which included a claim of ineffective assistance of trial counsel. *See Petition*, at 6. The foregoing claims were never presented to the state courts. Further, petitioner may now no longer present such claims to the state courts under Ohio's doctrine of *res judicata*. *See State v. Cole*, 2 Ohio St.3d 112 (1982); *State v. Ishmail*, 67 Ohio St.2d 16 (1981); *State v. Perry*, 10 Ohio St.2d 175 (1967).[2]

Consideration of petitioner's ineffective assistance of counsel claims are barred due to petitioner's failure to present such claims to the state courts. The state courts therefore were never given an opportunity to enforce the procedural rule due to the nature of petitioner's procedural default. This Court deems the first and second parts of the *Maupin* test to have been satisfied.

The Court must next decide whether the procedural rules barring petitioner's claims of ineffective assistance of counsel constitute adequate and independent bases upon which to foreclose review of petitioner's federal constitutional claims. This task requires the Court to balance the State's interests behind each procedural rule against the federal interest in reviewing federal claims. *See Maupin v. Smith*, 785 F.2d at 138. Under this analysis, the procedural rules barring petitioner's claims of ineffective assistance of counsel constitute adequate and independent state grounds for denying relief. The state courts must be given a full and fair opportunity to remedy alleged constitutional defects. The requirement that all available claims be raised at the first opportunity to do so serves the State's interests in finality and in ensuring that claims are adjudicated at the earliest possible opportunity. Additionally, the doctrine of *res judicata* is stated in unmistakable terms in numerous Ohio decisions and Ohio courts have consistently refused to review claims on

---

[2] As noted by respondent, petitioner also failed to file an appeal of the appellate court's decision denying his delayed 26(B) application to the Ohio Supreme Court. He may now no longer do so, as Ohio does not permit delayed appeals in 26(B) proceedings. Ohio Supreme Court Rule of Practice II, Section 2(A)(4)(b).

the merits under that doctrine. *See State v. Cole, supra; State v. Ishmail, supra; State v. Perry, supra.*

The Court concludes that petitioner has waived his right to present claims one, two, and four for federal habeas corpus review. Petitioner can still secure review of the merits of these claims if he demonstrates cause for his failure to follow the state procedural rules as well as actual prejudice from the constitutional violations that he alleges.

> "'Cause' under the cause and prejudice test must be something external to the petitioner, something that cannot fairly be attributed to him [;] ... some objective factor *external* to the defense [that] impeded ... efforts to comply with the State's procedural rule." *Coleman v. Thompson,* 501 U.S. 722, 753, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991)

*Maples v. Stegall,* 340 F.3d 433, 438 (6th Cir. 2003)(emphasis in original). Petitioner has failed to establish either cause or prejudice for his procedural default of claims one, two, and four.

Beyond the four-part *Maupin* analysis, this Court is required to consider whether this is "an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray v. Carrier*, 477 U.S. at 491; *see also Sawyer v. Whitley*, 505 U.S. 333. After review of the record, the Court does not deem this to be such a case.

## IV. CLAIM THREE

In claim three, petitioner asserts that he was improperly sentenced as a first time offender to consecutive sentences and to more than the minimum sentence under Ohio law and in violation of *Blakely v. Washington, supra.* Petitioner first presented such claim to the state courts in his April 12, 2005, motion for modification and correction of sentence. Exhibit 17 to Return of Writ.

Because the state trial court apparently has yet to issue a ruling on petitioner's motion, the claim is not exhausted.

Before a federal habeas court may grant relief, a state prisoner must exhaust his available remedies in the state courts. *Castille v. Peoples*, 489 U.S. 346, 349 (1989); *Silverburg v. Evitts*, 993 F.2d 124, 126 (6th Cir. 1993). If a habeas petitioner has the right under state law to raise a claim by any available procedure, he has not exhausted that claim. 28 U.S.C. §2254(b), (c). Moreover, a constitutional claim for relief must be presented to the state's highest court in order to satisfy the exhaustion requirement. *O'Sullivan v. Boerckel,* 526 U.S. 838, 844 (1999); *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990). But where alternative state remedies are available to consider the same claim, exhaustion of one of these remedies is all that is necessary. A habeas petitioner bears the burden of demonstrating that he has properly and fully exhausted his available state court remedies with respect to the claims he seeks to present for federal habeas review. *Prather v. Rees*, 822 F.2d 1418, 1420 n.3 (6th Cir. 1987).

Additionally, the time period during which a federal habeas petition is pending does not toll the running of the statute of limitations under 28 U.S.C. §2244(d)(2), *Duncan v. Walker,* 533 U.S. 167, 172 (2001). It thus appears that dismissal of this case in its entirety may bar any refiling. This Court must therefore consider whether a stay of proceedings is appropriate. *See Rhines v. Weber*, 125 S.Ct. 1528, 1534 (2005); *Palmer v. Carlton*, 276 F.3d 777, 781 (6th Cir. 2002).

In *Rhines v. Weber, supra*, the United States Supreme Court affirmed a District Court's authority to stay proceedings in unexhausted habeas corpus cases, rather than dismiss such cases in their entirety, so that the one-year statute of limitations would not prevent a petitioner from later presenting his claims in a federal habeas corpus petition. However, the Supreme Court held:

[S]tay and abeyance should be available only in limited circumstances. Because granting a stay effectively excuses a petitioner's failure to present his claims first to the state courts, stay and abeyance is only appropriate when the district court determines there was good cause for the petitioner's failure to exhaust his claims first in state court. Moreover, even if a petitioner had good cause for that failure, the district court would abuse its discretion if it were to grant him a stay when his unexhausted claims are plainly meritless. Cf. 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State").

* * *

On the other hand, it likely would be an abuse of discretion for a district court to deny a stay and to dismiss a mixed petition if the petitioner had good cause for his failure to exhaust, his unexhausted claims are potentially meritorious, and there is no indication that the petitioner engaged in intentionally dilatory litigation tactics. In such circumstances, the district court should stay, rather than dismiss, the mixed petition. *See Lundy*, 455 U.S., at 522, 102 S.Ct. 1198 (the total exhaustion requirement was not intended to "unreasonably impair the prisoner's right to relief"). In such a case, the petitioner's interest in obtaining federal review of his claims outweighs the competing interests in finality and speedy resolution of federal petitions. For the same reason, if a petitioner presents a district court with a mixed petition and the court determines that stay and abeyance is inappropriate, the court should allow the petitioner to delete the unexhausted claims and to proceed with the exhausted claims if dismissal of the entire petition would unreasonably impair the petitioner's right to obtain federal relief. *See id.,* at 520, 102 S.Ct. 1198 (plurality opinion) ("[A petitioner] can always amend the petition to delete the unexhausted claims, rather than returning to state court to exhaust all of his claims").

*Id.*, at 1535.  In *Pace v. DiGuglielmo*, 544 U.S. 408, 416 (2003), the Supreme Court stated that

[a] prisoner seeking state postconviction relief might... however, by filing a "protective" petition in federal court and asking the federal court to stay and abey the federal habeas proceedings until state remedies are exhausted....  A petitioner's reasonable confusion about

> whether a state filing would be timely will ordinarily constitute "good
> cause" for him to file in federal court.

*Id.*, citing *Rhines v. Weber, supra.* Federal courts have yet to achieve a consensus on what

constitutes good cause within the meaning of *Rhines v. Weber* for failing to exhaust state court

remedies.

> Various courts have adopted the standard for cause applicable to
> procedural defaults which requires that some "objective factor
> external to the defense" made it impossible to bring the claim earlier
> in the state court proceedings as required by *Coleman v. Thompson*,
> 501 U.S. 722, 755, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). *See e.g.,*
> *Fernandez v. Artuz* 2006 WL 121943, *5 (S.D.N.Y., Jan. 18, 2006);
> *Pierce v. Hurley*, 2006 WL 143717, *8 (S.D.Ohio, January 18, 2006);
> *Carter v. Friel,* 2006 WL 208872, *3 (D.Utah, Jan. 6, 2006);
> *Hernandez v. Sullivan,* 397 F.Supp.2d 1205, 1207 (C.D.Cal.2005).
> Others, such as *Jackson v. Roe*, 425 F.3d 654 (9th Cir.2005), and the
> remanded *Rhines v. Weber*, 2005 WL 3466015, *2-3 (D.S.D.,
> December 19, 2005), conclude that the cause standard of Rhines
> requires a lesser showing than that for procedural default.

> In *Jackson v. Roe*, the Ninth Circuit Court of Appeals concluded that
> good cause did not require a showing of "extraordinary
> circumstances." The Court said

> [W]e hold that the application of an "extraordinary circumstances"
> standard does not comport with the "good cause" standard prescribed
> by *Rhines. See NLRB v. Zeno Table Co.,* 610 F.2d 567, 569 (9th
> Cir.1979) (distinguishing between the "good cause" standard found
> in NLRB regulations and the "extraordinary circumstances" standard
> in section 10(e) of the National Labor Relations Act and noting that
> " 'good cause' ... appears to be less stringent than ... 'extraordinary
> circumstances' ").

> *Jackson*, 425 F.3d at 661-62.

> Thus, it would appear that good cause under *Rhines*, at least in this
> Circuit, should not be so strict a standard as to require a showing of

16

some extreme and unusual event beyond the control of the defendant. This is supported by the Supreme Court's observation in *Pace v. DiGuglielmo*, 544 U.S. 408, ---- - ----, 125 S.Ct. 1807, 1813-14, 161 L.Ed.2d 669 (2005), wherein the Court declared that a petitioner's confusion over whether or not his petition would be timely filed was "good cause" for the petitioner to file his unexhausted petition in the federal court.

Another court to discuss the standard of good cause under *Rhines* was the Eastern District of Pennsylvania. That court concluded that the good cause standard falls somewhere between the "lower threshold of unfairness," and the "higher standard of extraordinary circumstances, necessary for equitable tolling in capital cases." *See Baker v. Horn,* 383 F.Supp.2d 720, 747 (E.D.Pa.2005). This discussion of *Rhines,* while in the context of equitable tolling of a federal challenge in a capital case, examined whether the court should previously have granted a stay of the petition considering the petitioner's particular circumstances and the shifting state of the law in Pennsylvania at the time the original petitioner was filed.

The federal district courts have also developed a split of authority on whether ineffective assistance of post-conviction counsel qualifies as good cause to permit a stay of the federal proceedings. At least five district courts found that alleged ineffective assistance of counsel during post-conviction proceedings did constitute good cause for failure to exhaust claims in state proceedings, most without much discussion of the matter. *See e.g., Rhines v. Weber*, 408 F.Supp.2d 844, 847-48 (D.S.D.2005); *Ramchair v. Conway*, 2005 WL 2786975 at *16 (E.D.N.Y., Oct. 26, 2005); *Boyd v. Jones*, 2005 WL 2656639 at *4 (E.D.Mich., Oct. 14, 2005); *Fradiue v. Pliler,* 2005 WL 2204862 at *2 (E.D.Cal., Sept. 8, 2005); and *Martin v. Warren*, 2005 WL 2173365 at *2 (E.D.Mich., Sept. 2, 2005). Similarly at least three district courts found that alleged ineffective assistance of counsel during post-conviction proceedings did not constitute good cause. *See, e.g., Carter v. Friel,* 415 F.Supp.2d 1314, 1317-18, 2006 WL 208872, *3 (D.Utah, Jan. 6, 2006); *Vasquez v. Parrott*, 397 F.Supp.2d 452, 464 (S.D.N.Y.2005); *Hubbert v. Renico*, 2005 WL 2173612 at *3 (E.D.Mich., Sept. 7, 2005).

Thus, the split of authority is broad and varied.

17

*Riner v. Crawford*, 415 F.Supp.3d 1207, 1209-1211 (D.Nevada 2006).

In any event, petitioner was sentenced in December 2002, long before the United States Supreme Court issued its June 24, 2004, decision in *Blakely,* which is not to be retroactively applied to cases on collateral review, *Humphress v. United States*, 398 F.3d 855, 863 (6th Cir. 2005).

The Ohio Tenth District Court of Appeals denied petitioner's appeal on December 30, 2003. Petitioner's conviction therefore became final forty-five days later, when the time period expired to file a timely appeal to the Ohio Supreme Court. Ohio Supreme Court Rule of Practice II, Section 2(A)(1)(a); *Griffith v. Kentucky*, 479 U.S. 314, 321 n.6 (1987):

> By "final," we mean a case in which a judgment of conviction has been rendered, the availability of appeal exhausted, and the time for a petition for *certiorari* elapsed or a petition for *certiorari* finally denied. *See United States v. Johnson,* 457 U.S. 537, 542, n. 8, 102 S.Ct. 2579, 2582, n. 8, 73 L.Ed.2d 202 (1982) (citing *Linkletter v. Walker,* 381 U.S. 618, 622, n. 5, 85 S.Ct. 1731, 1733, n. 5, 14 L.Ed.2d 601 (1965)).

*Id.; see also Teague v. Lane* 489 U.S. 288 (1989); *Caspari v. Bohlen*, 510 U.S. 383, 390 (1994). *See also Wheeler v. Jones*, 226 F.3d 656, 659 (6th Cir. 2000) (conviction became final when the time for filing a direct appeal as a matter of right with the Michigan Court of Appeals expired.) Therefore, petitioner's *Blakely* claim appears to be plainly without merit.

Additionally, to the extent that this claim presents an issue of state law, such claim is not appropriate for federal habeas corpus review. A federal court may review a state prisoner's habeas petition only on the grounds that the challenged confinement is in violation of the Constitution, laws or treaties of the United States. 28 U.S.C. §2254(a). A federal court may not issue a writ of habeas corpus "on the basis of a perceived error of state law." *Pulley v. Harris*, 465 U.S. 37, 41 (1984);

*Smith v. Sowders*, 848 F.2d 735, 738 (6th Cir. 1988). A federal court does not function as an additional state appellate court reviewing state courts' decisions on state law or procedure. *Allen v. Morris*, 845 F.2d 610, 614 (6th Cir. 1988). "'[F]ederal courts must defer to a state court's interpretation of its own rules of evidence and procedure'" in considering a habeas petition. *Id.* (quoting *Machin v. Wainwright*, 758 F.2d 1431, 1433 (11th Cir. 1985)).

Further, it does not appear that petitioner can establish good cause for his failure to exhaust this claim in the state courts. Although *Blakely* was decided on June 24, 2004, petitioner waited almost one year, until April 12, 2005, to raise such claim in his motion to modify sentence with the state trial court.

For all of the foregoing reasons, the Magistrate Judge **RECOMMENDS** that claims one, two, and four be **DISMISSED** as procedurally defaulted, and that claim three be **DISMISSED** without prejudice as unexhausted.

If any party objects to this *Report and Recommendation*, that party may, within ten (10) days of the date of this report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the *Report and Recommendation* will result in a waiver of the right to have the district judge review the *Report and Recommendation*

19

de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the *Report and Recommendation.  See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).


June 6, 2006                                             *s/Norah McCann King*
                                                        Norah McCann King
                                                 United States Magistrate Judge